Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON WARGA, derivatively on behalf of COUPANG, INC., <br><br> Plaintiff, <br><br> v. <br><br> BOM SUK KIM, GAURAV ANAND, JASON CHILD, PEDRO FRANCESCHI, NEIL MEHTA, ASHA SHARMA, BENJAMIN SUN, AMBEREEN TOUBASSY, and KEVIN WARSH, <br><br> Defendants, <br><br> and <br><br> COUPANG, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Jason Warga ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Coupang, Inc. ("Coupang" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Bom Suk Kim ("Kim"), Gaurav Anand ("Anand"), Jason Child ("Child"), Pedro Franceschi ("Franceschi"), Neil Mehta ("Mehta"), Asha Sharma ("Sharma"), Benjamin Sun ("Sun"), Ambereen Toubassy ("Toubassy"), and Kevin Warsh ("Warsh") (collectively, the "Individual Defendants," and together with Coupang, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Coupang, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Kim and Anand for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coupang, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 6, 2025 through December 16, 2025, inclusive (the "Relevant Period").

2.      Coupang is a Delaware corporation  that provides "retail, restaurant delivery, video streaming, and fintech services to customers around the world under brands that

include Coupang, Eats, Play, Rocket Now, and Farfetch." Coupang primarily focuses on the South Korean market.

3.  Throughout the Relevant Period, the Individual Defendants either failed to maintain and/or caused the Company to fail to maintain adequate cybersecurity protocols which resulted in violations of, *inter alia*, SEC filing requirements.

4.  For example, on November 18, 2025, the Company became aware that its South Korean subsidiary, Coupang Corp., suffered a material cybersecurity incident. A further investigation revealed that the cybersecurity incident was the result of a former employee who had stolen a security key while working for Coupang and exploited a cybersecurity vulnerability (the "Data Breach"). The former employee thereafter accessed 33.7 million accounts and retained information from 3,000 accounts such as names, phone numbers, delivery addresses, email addresses, order histories, and 2,609 building access codes ("Personal Information").

5.  On December 1, 2025, Coupang purportedly began cooperating with the South Korean government in its investigation into the Data Breach. Throughout December 2025, the Company remained in constant communication with the South Korean government, and on December 16, 2025, Coupang retrieved some of the devices used by the former employee in the Data Breach. On December 18, 2025, the Company retrieved an additional device used in the Data Breach by the former employee.

6.  The applicable SEC reporting guideline for a material cybersecurity incident is Item 1.05 on Form 8-K. Specifically, Item 1.05 requires companies to report a material cybersecurity incident "within four business days after the registrant, without unreasonable delay, determines such information or within four business days after such information becomes available."

7.  Despite becoming aware of the Data Breach soon after its occurrence, the Individual Defendants concealed it from affected customers and the overall public for weeks.

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by allowing the Company to operate with deficient cybersecurity, which resulted in the Company failing to adequately protect customers' Personal Information from unauthorized access by Company outsiders. Specifically, the Company: (1) failed to follow industry-wide cybersecurity standards; (2) ignored both the value of customers' Personal Information and the risks associated with its unauthorized access; (3) failed to comply with FTC guidelines by engaging in "unfair or deceptive acts or practices in or affecting commerce;" and (4) failed to report the Data Breach in the applicable timeframe as set forth in Item 1.05 on Form 8-K (the "Cybersecurity Misconduct").

9.    During the Relevant Period, the Individual Defendants also breached their fiduciary duties by making and/or causing or the Company to make false and misleading statements pertaining to Coupang's cybersecurity and the ramifications of failing to report a data breach. For example, on August 5, 2025, the Company filed its Quarterly Report on Form 10-Q for the second quarter of 2025 (the "2Q 2025 Form 10-Q"). The 2Q 2025 Form 10-Q stated, in relevant part:

> Any failure to protect our apps, websites, networks, and systems against security breaches or otherwise protect our and our customers' and business partners' confidential information could damage our reputation and brand and adversely affect our business, financial condition, and results of operations.

10.    The truth began to emerge on November 30, 2025, when Reuters published an article titled "Top South Korean e-commerce firm Coupang apologises over massive data breach." (the "November 30 Reuters Article"). The November 30 Reuters Article revealed that Coupang had "apologised on Sunday over the breach of personal information from 33.7 million customer accounts through unauthorized data access." The November 30 Reuters Article further revealed that "[t]he government, *which held an emergency*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***meeting on Sunday, is looking into whether Coupang violated safety rules*** regarding personal information protection, said Minister of Science and ICT Bae Kyung-hoon."[1]

11.    The next day, Bloomberg published an article titled "Massive Coupang Data Leak Caps Record Year for Cyber Breaches." (the "December 1 Bloomberg Article"). The December 1 Bloomberg Article reported that "[a] massive Data Breach at [Coupang] caps what is set to be a record year for online leaks in the country, highlighting weaknesses in Seoul's cyber defenses." The December 1 Bloomberg Article additionally revealed that a former Coupang employee may have exploited a cybersecurity vulnerability, stating "***local media reported that a former Coupang employee could have exploited a system vulnerability***. Officials warned that the compromised information could be used to carry out targeted phishing attacks."

12.    On this news, the price per share of Coupang's common stock fell $1.51, or over 5.4%, from a closing price of $28.16 per share on November 28, 2025 to close at $26.65 per share on December 1, 2025.

13.    The truth fully emerged on December 16, 2025, when the Company filed a Current Report on Form 8-K with the SEC acknowledging the breach (the "December 2025 Form 8-K"). The December 2025 Form 8-K stated the following:

> On November 18, 2025, Coupang Corp. ("Coupang Corp."), a wholly-owned Korean subsidiary of Coupang, Inc. (Coupang Corp., together with Coupang, Inc. ("Coupang, Inc.," "our," or "we") and its subsidiaries and affiliates, "Coupang,"), became aware of a cybersecurity incident involving unauthorized access to customer accounts (the "Incident"). Upon discovery, Coupang activated its incident response processes, disabled the threat actor's unauthorized access, reported the Incident to the relevant Korean regulatory and law enforcement authorities, and warned customers whose data was potentially accessed.

> Based on investigative findings, Coupang has determined that a former employee may have obtained the name, phone number, delivery address, and email address associated with up to 33 million customer accounts, and certain

---

[1] All emphasis has been added unless otherwise stated.

order histories for a subset of the impacted accounts. To Coupang's knowledge, the former employee has not publicly disclosed the obtained data. No Coupang customers' banking information, payment card information, or login credentials were obtained or otherwise compromised in the Incident. Coupang is continuing its investigation and has engaged external forensic experts to assist with the investigation. Korean regulators have initiated investigations with which Coupang is fully cooperating. While one or more Korean regulators will potentially impose financial penalties, at this time we cannot reasonably estimate any amount of losses or range of losses that may result from such penalties.

Coupang's operations have not been materially disrupted. Coupang remains subject to various risks due to the Incident, including diversion of management's attention and potentially material financial losses resulting from the potential loss of revenue and potential higher expenses, including from remediation, regulatory penalties, and litigation.

The former chief executive officer of Coupang Corp., our Korean subsidiary, resigned on December 10, 2025, and Harold L. Rogers, General Counsel and Chief Administrative Officer of Coupang, Inc., is serving as interim chief executive officer of the Korean subsidiary.

14.    On this news, the price per share of Coupang's common stock fell $0.47, or 2.0%, from a closing price of $23.19 per share on December 16, 2025 to close at $22.72 per share on December 17, 2025.

15.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Coupang suffered a data breach which allowed a former employee to access customer information for approximately six months due to Coupang's inadequate cybersecurity procedures; (2) the Company engaged in the Cybersecurity Misconduct; and (3) as a result, Coupang suffered increased legal and

regulatory scrutiny. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

16.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Coupang to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 1, 2025 and September 30, 2025, approximately 2.8 million shares of Coupang common stock were repurchased, costing the Company over $80.5 million. As the Company's stock was actually worth only $22.72 per share, the price at which it was trading when markets closed on December 16, 2025, the Company overpaid for repurchases of its own stock by **over $16.1 million** in total.

17.    Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $31 million.

18.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chairman, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective

engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Kim's and Anand's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.    Plaintiff is a current shareholder of Coupang. Plaintiff has continuously held Coupang common stock at all relevant times.

### Nominal Defendant Coupang

26.     Coupang is a Delaware corporation with principal executive offices located at 720 Olive Way, Suite 600 Seattle, Washington 98101. Coupang also maintains an office at 605 Fairchild Drive, Mountain View, California 94043. Coupang's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CPNG."

**Defendant Kim**

27.     Defendant Kim has served as the Company's CEO, Chairman of the Board, and as a Company director since founding Coupang in May 2010. The Schedule 14A the Company filed with the SEC on April 28, 2025 (the "2025 Proxy Statement") stated that Defendant Kim owned 164,410,881 shares of Class B Common Stock, representing 74.3% of the total voting power. The Annual Report filed on Form 10-K with the SEC on February 25, 2025 (the "2024 Form 10-K") stated the following about the Company's concentration of ownership:

> All of our shares of Class B common stock, which has 29 votes per share, are beneficially owned by Mr. Kim, our Founder and Chief Executive Officer. Our Class A common stock, which is the stock we list on the NYSE, has one vote per share. Our Class A common stock and Class B common stock vote together as a single class on all matters, except as otherwise required by applicable law or our certificate of incorporation. Each share of our Class B common stock is convertible at any time at the option of the holder into one share of our Class A common stock. In addition, each share of our Class B common stock will convert automatically into one share of our Class A common stock upon any transfer, whether or not for value, except certain transfers to entities, to the extent the transferor retains sole dispositive power and exclusive voting control with respect to the shares of Class B common stock, and certain other transfers described in our certificate of incorporation. Upon any conversion of shares of Class B common stock into shares of Class A common stock, the voting power of any existing holder of Class A common stock in any vote of the Class A common stock voting separately as a class will be diluted to the extent of the additional shares of Class A common stock issued as a result of the conversion, but because there will be fewer shares of Class B common stock outstanding as a result of such a conversion, the voting power of any existing holder of Class A common stock in any vote of all shares of capital stock voting together as a class will increase because there

will be fewer shares of the higher vote Class B common stock outstanding. Because of the 29-to-one voting ratio between our Class B and Class A common stock, the Class B common stock beneficially owned by Mr. Kim represent, in the aggregate, 74.4% of the combined voting power of our capital stock as of December 31, 2024. The control by Mr. Kim of a majority of the combined voting power will limit or preclude your ability to influence corporate matters for the foreseeable future, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval. In addition, this may defer, prevent, or discourage unsolicited acquisition proposals or offers for our capital stock that you may believe are in your best interest as one of our stockholders. Mr. Kim also has the ability to control our management and major strategic investments as a result of his position as our Chief Executive Officer. Although Mr. Kim owes a fiduciary duty to the Company and our stockholders as a board member and officer, as a stockholder, Mr. Kim is entitled to vote his shares in his own interest, which may not always be in the interest of our stockholders generally. Similarly, a reduction in Mr. Kim's shareholdings could impact his ability to control corporate matters.

Thus, Defendant Kim is a controlling shareholder.

28.    The 2025 Proxy Statement stated the following about Defendant Kim:

Bom Kim founded our company and has served as our Chief Executive Officer and as Chairman of the Board since May 2010. Mr. Kim attended Harvard University, earning an A.B. degree in Government.

**Defendant Anand**

29.    Defendant Anand has served as the Company's CFO since December 2020. He also previously served as the Company's Chief Operating Officer from January 2019 until December 2020.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Anand made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|

| August 11, 2025 | 75,350 | $27.79 | $2,093,803 |
| November 10, 2025 | 75,350 | $29.02 | $2,186,619 |

Thus, in total, before the fraud was exposed, Defendant Anand sold 150,700 shares of Company stock on inside information, for which he received approximately $4.3 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.    The 2025 Proxy Statement stated the following about Defendant Anand:

**Gaurav Anand**. Gaurav Anand has served as our Chief Financial Officer since December 2020 and previously served as our Chief Operating Officer from January 2019 to December 2020. Mr. Anand previously served as the Chief of Staff to our Chief Executive Officer from January 2017 to December 2018 and our Chief Financial Officer of Global eCommerce from January 2017 to December 2017. Prior to joining Coupang, Mr. Anand served as Vice President of Finance at Myntra, a fashion subsidiary of Flipkart, from November 2014 to December 2016. Mr. Anand also previously worked at Amazon from 2007 to 2014, holding various Finance positions across its North America retail, international retail, AWS, and payments businesses.

**Defendant Child**

32.    Defendant Child has served as a Company director since April 2022. Defendant Child also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

33.    The 2025 Proxy Statement stated the following about Defendant Child:

Jason Child has served as a member of the Board since April 2022. Mr. Child has served as Executive Vice President and Chief Financial Officer of Arm Holdings plc, a technology company that provides processor designs and software platforms, since November 2022. Prior to joining Arm, Mr. Child served as Chief Financial Officer at various global companies, including as Senior Vice President and Chief Financial Officer of Splunk Inc., a technology company specializing in security and observability, from 2019 to 2022 and as Chief Financial Officer at Opendoor Technologies Inc., an online real estate company, from 2017 to 2019, as well as AliphCom, Inc. (d/b/a

Jawbone), a consumer technology and wearable device company, and Groupon, Inc., a global e-commerce marketplace. He holds a B.A. from the Foster School of Business at the University of Washington, where he currently serves on its Global Advisory Board.

**Defendant Franceschi**

34.    Defendant Franceschi has served as a Company director since March 2022. Defendant Franceschi also serves as a member of the Compensation Committee.

35.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Franceschi made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| September 11, 2025 | 21,428 | $32.05 | $686,767 |

Thus, in total, before the fraud was exposed, Defendant Franceschi sold 21,428 shares of Company stock on inside information, for which he received approximately $686,767 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.    The 2025 Proxy Statement stated the following about Defendant Franceschi:

Pedro Franceschi has served as a member of the Board since March 2022. Mr. Franceschi is Co-Founder & Chief Executive Officer of Brex, a company reimagining financial systems for fast-growing businesses. Launched in 2018 as the corporate card for startups, Brex now serves tens of thousands of companies through its expanded portfolio of financial services and software to help all fast-growing companies reach their full potential. Prior to launching Brex, Mr. Franceschi co-founded the payment company Pagar.me, a payment processor system, which was acquired by StoneCo Ltd., one of the largest payments companies in Brazil. At age 14, Mr. Franceschi built a popular window manager for Apple's iPad allowing users to manage multiple applications simultaneously. At the age of 12, Mr. Franceschi was the first person to build software to make Apple's Siri virtual assistant speak in Portuguese.

## Defendant Mehta

37.    Defendant Mehta has served as a Company director since December 2010.

38.    The 2025 Proxy Statement stated the following about Defendant Mehta:

Neil Mehta has served as a member of the Board since December 2010. Mr. Mehta founded Greenoaks Capital Partners LLC ("*Greenoaks*"), an investment firm, in 2012 and has served as a Managing Partner since founding the firm. Prior to Greenoaks, Mr. Mehta was a Senior Investment Professional for special situations investments in India, the Middle East, and Southeast Asia for Orient Property Group Ltd., a Hong Kong-based investment firm financed by a fund managed by D.E. Shaw & Co., L.P., from October 2007 to November 2009. Mr. Mehta also previously worked for Kayne Anderson Capital Advisors, an alternative investment firm, where he invested in private companies in the general business and technology sector. Mr. Mehta earned a BSc in Government from The London School of Economics and Political Science.

## Defendant Sharma

39.    Defendant Sharma has served as a Company director since June 2024. Defendant Sharma also serves as a member of the Compensation Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Sharma:

Asha Sharma has served as a member of the Board since June 2024. Ms. Sharma has been Corporate Vice President and Head of Product, AI Platform at Microsoft Corporation, a global technology provider, since March 2024. Prior to joining Microsoft, Ms. Sharma served as Chief Operating Officer of Maplebear Inc. (d/b/a Instacart), a leading provider of online grocery services, from February 2021 to March 2024. From August 2017 to February 2021, Ms. Sharma led product organizations at Meta Platforms, Inc. ("*Meta*"), a social networking company, where she was most recently Vice President of Product for Messenger, and oversaw messaging, video communication, and monetization efforts. Prior to Meta, Ms. Sharma served as the Chief Operating Officer and Corporate Secretary from July 2015 to August 2017 at Porch Group, Inc., a vertical software platform for the home, where she also served as Chief Marketing Officer from May 2013 to July 2015. She also served as a member of the board of directors of AppLovin Corporation, a mobile technology company, from August 2021 to September 2023. Ms. Sharma holds a B.S. in Business from the University of Minnesota's Carlson School

of Management.

**Defendant Sun**

41.     Defendant Sun has served as a Company director since July 2010. Defendant Sun also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

42.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sun made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| September 9, 2025 | 785,915 | $31.86 | $25,040,824 |
| September 9, 2025 | 29,882 | $32.35 | $966,802 |

Thus, in total, before the fraud was exposed, Defendant Sun sold 815,797 shares of Company stock on inside information, for which he received approximately $26 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

43.     The 2025 Proxy Statement stated the following about Defendant Sun:

Benjamin Sun has served on the Board since July 2010. Mr. Sun is General Partner and co-founder of Primary Venture Partners, an early-stage venture capital fund, since 2013. Mr. Sun also co-founded LaunchTime LLC ("**LaunchTime**") in January 2010, which invests in early-stage companies, and currently serves as a Partner. Previously, Mr. Sun served as President and Chief Executive Officer of Community Connect Inc., a leading online publisher, from October 1996 to December 2008 (Community Connect Inc. was acquired by Radio One, Inc. in 2008). Mr. Sun began his financial career in Investment Banking at Merrill Lynch. Mr. Sun earned a B.A. degree in Economics from the University of Michigan in 1995.

**Defendant Toubassy**

44.    Defendant Toubassy has served as a Company director since March 2023. Defendant Toubassy also serves as a member of the Audit Committee.

45.    The 2025 Proxy Statement stated the following about Defendant Toubassy:

Ambereen Toubassy has served as a member of the Board since March 2023. Ms. Toubassy has served as Chief Financial Officer of Airtable, a cloud-based software company, since January 2021. Prior to joining Airtable, Ms. Toubassy served as Chief Financial Officer of Quibi, a mobile media startup, from September 2018 to November 2020 and as Chief Financial Officer and Partner of WndrCo, a media and technology holding company, from May 2017 to September 2018. Her career spans multiple investing roles as partner and portfolio manager at JMB Capital, Ivory Capital Management, and Empyrean Capital Partners. Ms. Toubassy began her career at Goldman Sachs and worked in the Risk Arbitrage, M&A, and Software banking groups of Goldman Sachs. Ms. Toubassy holds a B.A. in Economics from Yale University and an MBA from Stanford University Graduate School of Business.

**Defendant Warsh**

46.    Defendant Warsh has served as a Company director since October 2019. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

47.    The 2025 Proxy Statement stated the following about Defendant Warsh:

Kevin Warsh has served as a member of the Board since October 2019. Since April 2011, he has served as the Shepard Family Distinguished Visiting Fellow in Economics at the Hoover Institution and lecturer at the Stanford Graduate School of Business. He has served on the board of directors of United Parcel Service, a multinational package delivery and supply chain management company, since July 2012. Governor Warsh is a member of the Group of Thirty and the Panel of Economic Advisers of the Congressional Budget Office, and Governor Warsh serves as partner at Duquesne Family Office LLC. Governor Warsh served as a member of the Board of Governors of the Federal Reserve System from 2006 until 2011. From 2002 until 2006, Governor Warsh served as Special Assistant to the President for Economic Policy and Executive Secretary of the White House National Economic Council. Previously, Governor Warsh was a member of the Mergers & Acquisitions department at Morgan Stanley & Co. in New York, serving as

Vice President and Executive Director. Governor Warsh received his A.B. from Stanford University, and J.D. from Harvard Law School.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.    By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Coupang and because of their ability to control the business and corporate affairs of Coupang, the Individual Defendants owed Coupang and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Coupang in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Coupang and its shareholders so as to benefit all shareholders equally.

49.    Each controlling shareholder, director, and officer of the Company owes to Coupang and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.    The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of Coupang, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.    To discharge their duties, the controlling shareholders, officers, and directors of Coupang were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.    Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as

controlling shareholders, directors, and/or officers of Coupang, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers, and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

53.    As controlling shareholders, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54.    To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of Coupang were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Coupang's corporate governance and applicable codes of

conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Coupang conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Coupang and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Coupang's operations would comply with all applicable laws and Coupang's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.    Each of the Individual Defendants further owed to Coupang and the

shareholders the duty of loyalty requiring that each favor Coupang's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Coupang and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, directorial, and controlling positions with Coupang, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Coupang.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and

(iii) artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Coupang was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Coupang and was at all times acting within the course and scope of such agency.

## COUPANG'S CODE OF CONDUCT

64.     Coupang's Code of Business Conduct and Ethics (the "Code of Conduct") states that it applies to "our directors and officers, and all employees at every level of our organization ("Covered Persons"). Complying with the law and these principles and standards is not only a legal requirement; it is an ethical obligation for everyone at Coupang."

65.     In a section titled "Following this Code," under the subheading titled "This

Code Applies To," the Code of Conduct states:

THIS CODE APPLIES TO:

• All officers and employees (including regular as well as part-time employees, fixed term, and any other types of workers hired by Coupang) at all levels of the organization worldwide and all members of the board of directors of Coupang, Inc. Any waiver of this Code for officers or directors may be made only by the board of directors or Audit Committee of Coupang, Inc. and will be disclosed to stockholders as required by applicable laws, rules, and regulations.

• All officers, employees (including regular as well as part-time employees, fixed term, and any other types of workers hired by Coupang), and directors of Coupang controlled subsidiaries.

66.    In a section titled "Responsibilities for Employees & Managers," under the subheading titled "For Our Employees:" the Code of Conduct states:

• Compliance: Follow the law at all times. If you see anyone violating the law or if you are asked to do something you believe may violate the law, speak up and report it immediately.

• Knowledge: Gain a basic understanding of this Code and our policies that are relevant to your work. You must also learn about any detailed business or country policies and understand how to apply them to your work.

• Awareness: Be aware of developments in your area that impact Coupang's compliance with laws and regulations. Coupang will update policies from time to time, so keep up to date with changes.

• Ask for help: From your manager, the Compliance department or other Coupang resources if you have questions about the application of this Code or our policies.

• Commitment: Report any ethics concerns about suspected or known non-compliance with this Code or our policies. Give your full and honest co-operation in any Coupang investigations.

Verified Shareholder Derivative Complaint

67.    In the same section, under a subheading titled "For Our Managers:" the Code of Conduct states:

• Culture: Coupang holds our leaders accountable for creating a culture of compliance where employees understand their responsibilities and feel comfortable reporting ethics concerns without fear of retaliation.

• Prevention: Set the example for compliance; not just through your words but through your actions. Your teams must understand that business results are never more important than ethical conduct and our compliance with laws, regulations, and our policies comes first. Communicate the importance of compliance and create an open environment where every employee feels comfortable reporting ethics concerns.

• Detection: With the assistance of the Compliance department, implement and monitor appropriate business processes. Conduct periodic compliance reviews to ensure ongoing effectiveness of business processes.

• Response: Take prompt corrective action to address identified compliance weaknesses. Document and escalate any employee's reported ethics concerns through the appropriate channels. Take appropriate disciplinary action where required.

68.    In the same section, under the subheading titled "The Cost of Non-Compliance:" the Code of Conduct states, in relevant part:

• Disciplinary action: Employees and managers who do not fulfill their compliance responsibilities as required by this Code and Coupang's policies, or laws and regulations, will face disciplinary action up to and including termination of their employment, and in appropriate cases, possible civil legal action, or referral for criminal prosecution.

69.    In a section titled "Speak Up if Something isn't Right," under a subheading titled "Speaking Up Isn't Easy, But:" the Code of Conduct states:

• We must all strive to maintain a working environment that encourages employees to speak up if something does not look or feel right. When we report ethics concerns, we make Coupang stronger, and we protect our

colleagues from harm. Speaking up also helps Coupang address issues early before more serious consequences develop.

• You do not need to be certain that a violation has occurred. Ethics concerns should be reported in good faith, which means that you have made a genuine attempt to provide honest and accurate information, even if you are later proven to have been mistaken.

• You have an obligation to report an ethics concern when you see a situation in which laws, regulations, this Code, or our policies are not being followed.

• Retaliation against any employee who reports an ethics concern and/or participates in an investigation is prohibited and is grounds for disciplinary action up to and including termination of employment.

70.    In a section titled "Compliance with Laws & Regulations," under a subheading titled "Coupang Is Committed To:" the Code of Code of Conduct states:

• Conducting business in an ethical, transparent, and professional manner, and in compliance with laws, regulations, and our policies.

• Incorporating legal and regulatory requirements into our business strategy and processes.

• Developing strong processes to anticipate risks, including new and changing legal and regulatory requirements.

• Providing employees and managers with access to the subject matter expertise needed to manage legal and regulatory risks.

• Monitoring regulatory compliance on an ongoing basis and periodically reviewing key processes.

• Remaining compliant with applicable licensing, permitting and other applicable rules and regulations in the locations where we operate.

71.    In a section titled "Protection and use of company assets," under a subheading titled "Coupang is Committed To:" the Code of Conduct states:

• Promoting protection and efficient use of company's assets by its directors, officers, and employees.

• Protecting the organization, shareholders, employees, customers, suppliers, service providers, and other stakeholders from risks of fraud, theft, and misuse, etc.

• Promoting integrity and transparency and prohibiting fraud, theft, and intentional misconduct of any kind against Coupang. This includes the theft or abuse of company funds, property, and assets of any kind for any purpose.

• Maintaining Anti-Fraud Policy that forms the framework to support and sustain effective fraud management across Coupang.

72.    In the same section, under a subheading titled "Covered Persons Must:" the Code of Conduct states:

• Act with honesty, integrity, and professionalism.

• Not engage in fraud, theft, or intentional dishonesty of any kind against Coupang, its employees, officers, directors, or business partners including creating falsified or forged documents, or abusing any position of trust.

• Not engage in activities such as theft, waste or abuse of company funds, property, or assets including cash, credit cards, equipment, supplies and other tangible and intangible assets.

• Use company property including information technology system, and other technology resources only for legitimate business purposes, although incidental personal use may be permitted basis adequate approvals.

• Report any actual or suspected incidents of fraud, theft or misuse of company's assets using any of the Speak Up channels.

73.    In a section titled "Conflicts of Interest," under a subheading titled "Our Policy:" the Code of Conduct states:

• We have a responsibility to all our stakeholders to make decisions based on Coupang's interests, without regard to personal gain. Covered Persons must

always make business decisions based on what is best for Coupang, never what is best for you or your household personally. Nothing you do should interfere, or appear to interfere, with your responsibility for objective and unbiased decision-making on behalf of Coupang.

• Covered Persons must disclose if any situation creates or could create a conflict of interest. Conflict of interest situations can come up in many ways including instances where Covered Persons have an interest or association (an outside business interest) that may interfere with Coupang's interests, or where Covered Persons have close personal relationships or close financial relationships with other colleagues or third parties.

• No activity of Covered Persons at work or at home should harm Coupang's reputation. Misusing company property, resources or influence is prohibited; even when nothing wrong is intended, the perception of a conflict may have a negative impact on Coupang.

74.    In the same section, under a subheading titled "Covered Persons Must:" the Code of Conduct states:

• Promptly disclose any situation which creates, or could create, a conflict of interest.

• Only use company property and assets to perform Coupang-related activities (and not for personal gain).

• Obtain prior approval from the People department before hiring or directly supervising someone with whom you have a family or close personal relationship.

• Obtain prior approval from the Compliance department before accepting director or officer positions with an outside business or not-for-profit organization.

• Disclose to the Compliance department any financial interests you have in any company where you could personally affect Coupang's business with that company.

• Not accept gifts, entertainment, or anything else of value from third parties doing business or seeking to do business with Coupang.

• Avoid participating in outside activities that compete with Coupang directly or indirectly.

• Avoid taking, or directing a third party to take, business or investment opportunities discovered through the use of Coupang's property, information, or position.

75.     In a section titled "Protecting Personal & Business Information," under a subheading titled "Coupang Is Committed To:" the Code of Conduct states:

• Protecting personal and business information in compliance with applicable laws, regulations, and our policies (including our document management and retention requirements).

• Respecting and protecting the privacy rights of individuals. Coupang treats personal information with the care it deserves so that we can maintain the trust of our customers, partners, staff, and other individuals who we collect information from.

• Protecting our networks, systems, equipment, and information from external and insider threats. Coupang maintains robust controls to protect our systems and information, conducts security testing, and constantly monitors for cyber security threats and vulnerabilities.

• Disclosing material information regarding Coupang to the public only through approved processes and specific limited channels. Coupang coordinates its communications to ensure information is accurate, is properly disclosed, and that all those with an interest in the company will have equal access to such information.

76.     In the same section, under a subheading titled "Covered Persons Must:" the Code of Conduct states, in relevant part:

• Only collect and retain personal and business information that is needed to perform your role. Manage information securely and in compliance with Coupang's policies, standards, and document management and retention requirements.

• Protect personal and business information from unauthorized or accidental access, loss, disclosure, or destruction. This includes limiting access to authorized individuals who need the information for legitimate business purposes, only using Coupang-approved systems and devices (and not using personal email, software, or devices to conduct Coupang business), and being aware of efforts by third parties to improperly obtain personal and business information.

77.    In the section titled "Financial Integrity & Accounting," under subheading titled "Coupang is Committed To:" the Code of Conduct states:

• Providing that our accounting and reporting completely and accurately reflects the economic substance of Coupang's business activities, consistent with generally accepted accounting principles, standards, and regulations for accounting and financial reporting.

• Preparing complete, accurate, and timely financial information for use in reports and other disclosures to management, investors, regulators, and other stakeholders.

• Ensuring that management decisions are based on sound economic analysis based on comprehensive facts and with appropriate consideration of the short- and long-term benefits and risks.

• Complying with all applicable laws and regulations as well as our policies and internal controls requirements, including regarding the retention of documents and records.

78.    In the same section, under a subheading titled "Covered Persons Must:" the Code of Conduct states:

• Maintain complete, accurate, and timely records and accounts to appropriately reflect all business transactions.

• Create documents that are complete, accurate, and transparent, and follow our policies in determining when to retain and dispose of documents and records.

• Never engage in or support inappropriate transactions, including those that

misrepresent the substance of a transaction.

• Maintain effective processes and internal controls that completely and accurately reflect transactions, as well as prevent or detect inappropriate transactions.

• Speak up if you become aware of a questionable transaction or accounting by notifying the Accounting leadership team or using any of the Speak Up channels.

79.    In the section titled "Insider Trading," under a subheading titled "Coupang is Committed To:" the Code of Conduct states:

• It is illegal to buy or sell stock or other securities based on material, non-public information or inside information. Inside information is any material, non-public information a reasonable investor is likely to consider important when making an investment decision. Some common examples would include periodic sales or earnings information for Coupang, Inc. prior to the public release of such information, projections of future earnings or loss or news of a significant event such as a pending merger, a change in operations structure, or a change in executive management.

• It is also illegal to communicate or tip inside information to others so they can buy or sell stock or other securities based on such information. If you are aware of inside information about Coupang or any other company with which Coupang does business (collectively, "business partners"), including our suppliers when you are aware of inside information about such business partner as a result of your employment or other relationship with Coupang, you are prohibited from trading directly or indirectly or tipping others to trade in stock or other securities of that company. These same restrictions apply to family members who reside with you, other household members and any other individuals or entities whose transactions in securities are influenced, directed, or controlled by you (unless otherwise determined by Coupang).

80.    In the same section, under a subheading titled "Covered Persons Must:" the Code of Conduct states:

• Never buy or sell stock or other securities of Coupang or its business partners while you have inside information about that company.

• Never recommend anyone buy or sell stock or other securities of Coupang or its business partners while you have inside information about that company.

• Never disclose inside information about Coupang to anyone outside of Coupang (including your family members), unless such information has been released to the general public or unless such disclosure has been approved by the Corporate Securities department and only after the Corporate Securities department has informed you that adequate steps have been taken to prevent misuse of the information.

 • Disclose inside information to people within Coupang only on a need-to-know basis.

• Never attempt to manipulate market prices or spread market rumors or false information.

• Never buy or sell Coupang securities while the trading window is closed if you are subject to trading windows as described in Coupang's Insider Trading Policy.

• Obtain pre-clearance before trading in Coupang securities if you are subject to pre-clearance procedures as described in Coupang's Insider Trading Policy.

81.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Cybersecurity Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting combined total proceeds of approximately $31 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations,

conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## COUPANG'S AUDIT COMMITTEE CHARTER

82.    According to Coupang's Audit Committee Charter, the purpose of the Audit Committee is to:

> • oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;
>
> • oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");
>
> • maintain and foster an open avenue of communication with the Company's management, and Auditors;
>
> • review any reports or disclosures required by applicable law and stock exchange listing requirements;
>
> • help the Board oversee the Company's legal and regulatory compliance, including the internal audit function, legal function, compliance program, and risk assessment; and
>
> • provide regular reports and information to the Board.

83.    Under the heading "Responsibilities," in a subheading titled "Financial Review and Disclosure:" the Audit Committee Charter states the responsibilities of the Audit Committee, in relevant part, as:

> 7. Audited Financial Statement Review; Quarterly and Annual Reports. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors prior to filing. The Committee will be responsible for recommending to the Board whether

the proposed financial statements should be included in the Company's Form 10-K.

*** 

9. Earnings Press Releases. The Committee will review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

10. Accounting Principles and Policies. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

• critical accounting policies and practices;

• alternative accounting policies available under GAAP;

• the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

• any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

84.    In the same section, under the subheading "Internal Control and Procedures:" the Audit Committee Charter defines the responsibilities of the Audit Committee, in relevant part, as:

12. Risk Assessment and Management. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. In exercising oversight of the Company's risk identification and management processes, the Committee may consider issues such as the Company's policies and other matters relating to the Company's investments, cash management

and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

13. Internal Control over Financial Reporting; Disclosure Controls. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

14. Correspondence with Regulators. The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

85.    In the same section, under a subheading titled "Other Matters:" the Audit Committee Charter defines the Audit Committee responsibilities in relevant part, as:

21. Other Legal and Finance Matters. The Committee will review with management legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

86.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Cybersecurity Misconduct and to issue materially false or misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual

Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87.    Coupang is a technology and e-commerce company providing retail, restaurant delivery, video streaming, and fintech services to customers around the world under various brands such as Coupang, Coupang Eats, Coupang Play, and Farfetch. Although Coupang is a global company, their primary market is South Korea. Indeed, in the 2024 fiscal year, over 90% of Coupang's total net revenues were from Korea.

### The Cybersecurity Misconduct

#### *Coupang's Promises to Protect Customer's Privacy*

88.    Throughout the Relevant Period, the Company promised customers that it would keep their Personal Information secure from unauthorized access.

89.    For example, Coupang maintains a website discussing its privacy promises (the "Privacy Website").[2]  In a section titled "Combining the power of technology with world-leading experts to keep you protected," the Privacy Website states:

> The importance of providing secure and trusted services is deeply embedded within the culture of Coupang.
>
> We have world-leading systems and technology to keep your information safe and secure. Coupang monitors these systems around the clock, upgrading processes to adapt to changing cyber threats as they emerge. This is supported by continued and significant investment into security and privacy to make sure our standards are aligned with, and where possible exceed global best practice. Coupang trains our staff in how to handle data. We aim to empower and encourage our people to challenge existing practices and believe it is the

---

[2] https://privacy.coupang.com/en/

shared responsibility of every employee at Coupang to remain vigilant and committed to data security.

We are also committed to working closely with governments and regulators to help shape the future of our industry.

90.    However, Defendants violated the Privacy Website by failing to implement proper cybersecurity to protect customers' Personal Information, resulting in the Data Breach, discussed below.

### Coupang Failed to Follow Industry-Wide Cybersecurity Standards

91.    Under widely accepted industry standards, Coupang was required to protect customers' Personal Information from unauthorized access by Company outsiders.

92.    For years, Coupang knew that proper human management of sensitive customer information was critical to protecting against data breaches. For example, in 2021, Verizon conducted a study which revealed that "almost half of the breaches in [the financial sector] were caused by [i]nternal [a]ctors committing various types of [e]rrors."[3] Further, a recent study by IBM revealed that "human error is the main cause of 95% of cyber security breaches."[4] As a result, Coupang knew that, under widely-accepted industry standards, preventing this type of human error was critical to preventing a data breach. For example, the Cybersecurity and Infrastructure Security Agency ("CISA") of the U.S. government has stated that "[p]revention is the most effective defense against ransomware."[5] Even though Defendants knew of the risks associated with human error and the importance of preventing them, the Company failed to establish adequate cybersecurity to protect customers' Personal Information from unauthorized access.

---

[3] https://www.verizon.com/business/resources/reports/dbir/2021/data-breach-statistics-byindustry/
financial-services-data-breaches/.
[4] https://blog.usecure.io/the-role-of-human-error-in-successful-cyber-security-breaches
[5] https://twitter.com/cisagov/status/1392541355893743626?lang=nl

93.    Throughout the Relevant Period, there were various cybersecurity measures the Company could have implemented to protect customers' Personal Information from unauthorized access by Company outsiders. For example, the Microsoft Threat Protection Intelligence Team recommends that companies, among other things, apply the latest security updates, use threat and vulnerability management, and monitor for adversarial activities in order to protect private information.[6]

94.    By implementing these cybersecurity measures, Defendants could have prevented the Data Breach and its resulting harm to customers and investors. However, because Defendants failed to implement adequate cybersecurity measures, customers' Personal Information was vulnerable to improper access by Company outsiders throughout the Relevant Period, thus resulting in the Data Breach.

### Coupang Ignored the Value and Risks Associated with Customers' Personal Information

95.    Throughout the Relevant Period, Coupang was aware of the sensitivity of customers' Personal Information and of its value to those wishing to use it improperly. For example, the FTC has stated that scammers use this type of information to commit identity theft, often "buy[ing] things with [customers'] credit cards" or "pretending to be [the customer] if [the identity thief] [is] arrested."[7] Additionally, criminals are able to sell customers' Personal Information for significant profits on the digital black market, which functions as an "illegal marketplace for drugs, firearms, [and] stolen data."[8]

96.    Further, the FTC has stated that it now considers sensitive data to be a form of currency. For example, one former FTC commissioner noted in a report that:

Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be

---

[6]https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

[7] https://consumer.ftc.gov/articles/what-know-about-identity-theft

[8]https://shuftipro.com/blog/the-digital-black-market-for-identity-data/

commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.

97.    In addition, this valuable Personal Information can be used by thieves in various ways. In fact, thieves are often able to access customers' Personal Information through obtaining smaller seemingly unimportant pieces of data and tracing that data back to the customer. For example, the FTC stated in a staff report that "technological advances and the ability to combine disparate pieces of data can lead to the identification of a customer" even if "the individual pieces of data do not constitute [Personal Information]."[9] Once a thief has access to this sensitive data, the customer is left vulnerable to both fraud and identity theft. In fact, according to a February 2022 FTC report, "over the past three years, annual reports of identity theft and fraud have doubled to more than 5.7 million."[10] Further, risks and costs associated with identity theft are often an ongoing concern for affected customers, as "[o]n average, it can take 100 to 200 hours over six months to undo identity theft."[11]

98.    As a result, Defendants knew of the sensitivity of customers' Personal Information and of the risks associated with this information being accessed by unauthorized Company outsiders. Still, Defendants failed to implement proper cybersecurity to protect this information, thus resulting in the Data Breach.

### Coupang Failed to Comply With FTC Guidelines

99.    The Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) prohibits companies from engaging in "unfair or deceptive acts or practices in or affecting

---

[9] https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf

[10] https://www.aura.com/learn/how-long-does-it-take-to-recover-from-identity-theft#:~:text=Identity%20theft%20is%20the%20crime,(FTC)%20%5B*%5D.

[11] https://www.identityhawk.com/identity-theft-recovery-time/#:~:text=The%20Federal%20Trade%20Commission%20(FTC,and%20200%20hours%20of%20work.

commerce." In addition, the FTC has acknowledged that a company's failure to implement proper cybersecurity to protect customers' private data is an "unfair practice" which violates the FTC Act.

100.    The FTC has repeatedly emphasized the importance of companies implementing proper cybersecurity by providing useful resources for businesses. For example, the FTC's website contains a section titled "Cybersecurity Basics" designed to "help protect your business and reduce the risk of a cyber attack."[12] In that section, the FTC recommends that, at the bare minimum, companies update their software, secure their files, require passwords, encrypt devices, and use multi-factor authentication to protect against possible cyber-attacks.[13] Further, the FTC suggests that companies "make smart security [their] business as usual" by requiring strong passwords, training all staff, and having a plan for "saving data, running the business, and notifying customers if [a company] experience[s] a breach."[14]

101.    However, throughout the Relevant Period, Defendants failed to implement these basic cybersecurity measures to protect customers' Personal Information, thus violating the FTC Act's prohibition on engaging in "unfair or deceptive acts or practices in or affecting commerce."

### *The Data Breach*

102.    On November 18, 2025, Coupang became aware that its Korean subsidiary, Coupang Corp., suffered a cybersecurity incident involving unauthorized access to approximately 33.7 million customer accounts.

103.    After an investigation, Coupang determined that a former employee was the cause of the Data Breach. The former employee had allegedly stolen a security key while working for Coupang and used the security key along with a personal computer and a MacBook laptop to exploit a cybersecurity vulnerability and access customer information

---

[12] https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/basics
[13] *Id.*
[14] *Id.*

such as customer names, emails, addresses, and phone numbers. The former employee also accessed 2,609 building entrance codes. It was also revealed that the former employee had retained access to Coupang's systems even after leaving the Company.

104.   It was later revealed that the former employee had accessed 33 million accounts and retained user data from 3,000 customer accounts.

105.   Throughout the Relevant Period, the Company coordinated with the South Korean government to identify the former employee and recover the leaked information. Coupang began coordinating with the South Korean government on December 1, 2025, and the next day, Coupang received an official, written letter from the South Korean government regarding the Data Breach.

106.   On December 9, 2025, the South Korean government proposed that Coupang contact the former employee and on December 14, 2025, Coupang met with the former employee and reported the details of the meeting to the South Korean government.

107.   On December 16, 2025, Coupang reported to the South Korean government that it had recovered the former employee's devices used in the Data Breach. On December 18, 2025, Coupang retrieved another computer used in the Data Breach from a nearby river.

108.   Item 1.05 of Form 8-K, "Material Cybersecurity Incidents," details what a company must report to the SEC once it determines that there has been a material cybersecurity incident. Specifically, Item 1.05 of Form 8-K states:

(a) ***If the registrant experiences a cybersecurity incident that is determined by the registrant to be material, describe the material aspects of the nature, scope, and timing of the incident***, and the material impact or reasonably likely material impact on the registrant, including its financial condition and results of operations.

(b) A registrant shall provide the information required by this Item in an Interactive Data File in accordance with Rule 405 of Regulation S-T and the EDGAR Filer Manual.

(c) Notwithstanding General Instruction B.1. to Form 8-K, *if the United States Attorney General determines that disclosure required by paragraph (a) of this Item 1.05 poses a substantial risk to national security or public safety, and notifies the Commission of such determination in writing, the registrant may delay providing the disclosure required by this Item 1.05 for a time period specified by the Attorney General, up to 30 days following the date when the disclosure required by this Item 1.05 was otherwise required to be provided*. Disclosure may be delayed for an additional period of up to 30 days if the Attorney General determines that disclosure continues to pose a substantial risk to national security or public safety and notifies the Commission of such determination in writing. In extraordinary circumstances, disclosure may be delayed for a final additional period of up to 60 days if the Attorney General determines that disclosure continues to pose a substantial risk to national security and notifies the Commission of such determination in writing. Beyond the final 60-day delay under this paragraph, if the Attorney General indicates that further delay is necessary, the Commission will consider additional requests for delay and may grant such relief through Commission exemptive order.

(d) Notwithstanding General Instruction B.1. to Form 8-K, if a registrant that is subject to 47 CFR 64.2011 is required to delay disclosing a Data Breach pursuant to such rule, it may delay providing the disclosure required by this Item 1.05 for such period that is applicable under 47 CFR 64.2011(b)(1) and in no event for more than seven business days after notification required under such provision has been made, so long as the registrant notifies the Commission in correspondence submitted to the EDGAR system no later than the date when the disclosure required by this Item 1.05 was otherwise required to be provided.

Instructions to Item 1.05.

1. A registrant's materiality determination regarding a cybersecurity incident must be made *without unreasonable delay after discovery of the incident.*

2. To the extent that the information called for in Item 1.05(a) is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 1.05 *containing such information within four business days after the registrant, without*

*unreasonable delay, determines such information or within four business days after such information becomes available.*

3. The definition of the term "cybersecurity incident" in §229.106(a) [Item 106(a) of Regulation S-K] applies to this Item.

4. A registrant need not disclose specific or technical information about its planned response to the incident or its cybersecurity systems, related networks and devices, or potential system vulnerabilities in such detail as would impede the registrant's response or remediation of the incident.

109.    Coupang failed to disclose the Data Breach by November 24, 2025, four days after Coupang was required to do so by the SEC. Upon information and belief, Coupang did not receive a filing exemption from the Attorney General of the United States to exempt it from reporting the Data Breach on a Form 8-K.

## FALSE AND MISLEADING STATEMENTS

### August 5, 2025 Form 10-Q

110.    On August 5, 2025, after the markets closed, Coupang filed the 2Q 2025 Form 10-Q. The 2Q 2025 Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were signed by Defendants Kim and Anand attesting to the accuracy of the 2Q 2025 Form 10-Q and that the 2Q 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

111.    The 2Q 2025 Form 10-Q incorporated by reference Coupang's risk disclosures from the 2024 Form 10-K. Specifically, the 2024 Form 10-K included the following risk disclosure:

*Any failure to protect our apps, websites, networks, and systems against security breaches or otherwise protect our and our customers' and business partners' confidential information could damage our reputation and brand and adversely affect our business, financial condition, and results of operations.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Our business employs websites, networks, and systems through which we collect, maintain, transmit, and store data about our customers, merchants, suppliers, advertisers, and others, including personally identifiable information, as well as other confidential and proprietary information. ***We rely on encryption and authentication technology in an effort to securely transmit confidential and sensitive information. However, security breaches or other security incidents have in the past resulted and could in the future result in the inadvertent or unauthorized use or disclosure of confidential and sensitive information we collect, store, or transmit, or otherwise enable third parties to gain unauthorized access to this information such as our inadvertent exposure of limited customer information within our App that occurred during an upgrade in 2021 and was remediated within an hour***. In addition, our apps, websites, networks, and systems are subject to security threats, including hacking of our systems, denial-of-service attacks, viruses, malicious software, ransomware, break-ins, phishing attacks, social engineering, security breaches, or other attacks and similar disruptions that may jeopardize the security of information stored in or transmitted by our apps, websites, networks, and systems, or that we otherwise maintain. Such risks extend not only to our own apps, websites, networks, and systems, but also to those of third-party services providers and our customers, contractors, business partners, vendors, and other third parties. Moreover, techniques used to obtain unauthorized access to or sabotage systems change frequently and are becoming increasingly sophisticated and may not be known until launched against us or our third-party service providers, increasing the difficulty of detecting and defending against such threats. We have observed an increase in the frequency of the security threats we and our third-party service providers face, and we expect these activities to continue to increase. Geopolitical tensions or conflicts, such as the conflict between Russia and Ukraine, and the increased adoption of artificial intelligence technologies, may further heighten the risk of cyber security incidents. In addition, security breaches can also occur as a result of nontechnical issues, including intentional or inadvertent breaches by our employees or by persons with whom we have commercial relationships. As a result of any security breach, our reputation and brand could be damaged, our business could suffer, we could be required to expend significant capital and other resources to alleviate problems caused by such breaches, and we could be exposed to a risk of loss, litigation, or regulatory action and possible liability. Actual or anticipated attacks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees, and engage third-party experts and consultants. Any compromise or breach of our security measures, or those of our third-party service providers, could violate

41

applicable privacy, data security, and other laws, and cause significant legal and financial exposure, adverse publicity, and a loss of confidence in our security measures, which could have an adverse effect on our business, financial condition, and results of operations.

We are also subject to regulations relating to privacy and use of confidential information of our consumers, including, among others, Korea's Personal Information Protection Act and related legislation, regulations and orders (the "PIPA"), China's Personal Information Protection Act, the Act on the Promotion of Information and Communications Network Utilization and Protection of Information Act (Korea), and the Credit Information Act in Korea that specifically regulates certain sensitive personal information. PIPA requires consent by the consumer with respect to the use of his or her data and requires the persons responsible for management of personal data to take the necessary technological and managerial measures to prevent Data Breaches and, among other duties, to notify the Personal Information Protection Commission of any Data Breach incidents within 24 hours.

Failure to comply with PIPA in any manner may subject these persons responsible to personal liability for not obtaining such consent in an appropriate manner or for such breaches, including even negligent breaches, and violators face varying penalties ranging from monetary penalties to imprisonment. We strive to take the necessary technological and managerial measures to comply with PIPA, including the implementation of privacy policies concerning the collection, use, and disclosure of subscriber data on our apps and websites, and we regularly review and update our policies and practices. Despite these efforts to comply with PIPA, these rules are complex and evolving, subject to interpretation by government regulators which may change over time and therefore we are subject to the risk of claims by regulators of failure to comply with PIPA. ***Any failure, or perceived failure, by us to comply with such policies, laws, regulations, and other legal obligations and regulatory guidance could adversely affect our reputation, brand, and business, and may result in claims, proceedings, or actions, including criminal proceedings, against us and certain of our executive officers by governmental entities or others or other liabilities. Any such claim, proceeding, or action, could hurt our reputation, brand, and business, force us to incur significant expenses in defense of such proceedings, distract our management, increase our costs of doing business, result in a loss of customers and merchants, and could have an adverse effect on our business, financial condition, and results of operations.***

112.   On November 4, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC for the third quarter of 2025 (the "3Q 2025 Form 10-Q"). The 3Q 2025 Form 10-Q contained the same SOX certifications by Defendants Kim and Anand as discussed in ¶ 110 *supra*.

113.   The 3Q 2025 Form 10-Q contained the same false and misleading risk disclosures discussed in ¶ 111 *supra*.

114.   The above statements in ¶¶ 110-113 were materially false and misleading and failed to disclose, *inter alia*, that: (1) Coupang suffered a Data Breach which allowed a former employee to access customer information for approximately six months due to Coupang's inadequate cybersecurity procedures; (2) the Company engaged in the Cybersecurity Misconduct; and (3) as a result, Coupang suffered increased legal and regulatory scrutiny. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

115.   The truth began to emerge on November 30, 2025, when Reuters published the November 30 Reuters Article. The November 30 Reuters Article revealed that Coupang had "apologised on Sunday over the breach of personal information from 33.7 million customer accounts through unauthorized data access." The November 30 Reuters Article further stated that "[t]he government, ***which held an emergency meeting on Sunday, is looking into whether Coupang violated safety rules*** regarding personal information protection, said Minister of Science and ICT Bae Kyung-hoon."

116.   The next day, Bloomberg published the December 1 Bloomberg Article. The December 1 Bloomberg Article reported that "[a] massive data breach at [Coupang] caps what is set to be a record year for online leaks in the country, highlighting weaknesses in Seoul's cyber defenses." The December 1 Bloomberg Article additionally stated that "***local***

*media reported that a former Coupang employee could have exploited a system vulnerability*. Officials warned that the compromised information could be used to carry out targeted phishing attacks."

117. The December 1 Bloomberg Article also discussed how the Data Breach was making waves across Korean media, stating:

> Korean newspapers splashed the story across front pages [. . .] as worries mounted over possible disruptions following the breach. With nearly 25 million active users, many Korean families rely on the Amazon-like retailer for the bulk of their shopping, ***typically handling over sensitive information like apartment door codes to facilitate deliveries.***

118. On this news, the price per share of Coupang's common stock fell $1.51 or over 5.4%, from a closing price of $28.16 per share on November 28, 2025 to close at $26.65 per share on December 1, 2025.

119. The truth continued to emerge on December 10, 2025, when the New York Times published an article titled "C.E.O. Resigns in Fallout Over Massive South Korean Data Breach." (the "December 10 New York Times Article"). The December 10 New York Times Article stated, in relevant part:

> ***The head of the South Korean unit of the e-commerce company Coupang resigned on Wednesday***, as the fallout from a Data Breach affecting nearly 34 million users of the online shopping site intensifies.

> Park Dae-jun, who became the sole chief executive of Coupang's business in South Korea earlier this year, ***said in a statement released by the company that he was resigning to accept "grave responsibility" over the data leak***, which was announced last month. Coupang is headquartered in Seattle, but nearly all of its revenue comes from South Korea, ***where it is as ubiquitous as Amazon is in the United States.***

> Coupang first detected a Data Breach on Nov. 18 that exposed the personal information of roughly 4,500 customers. It issued another statement on Nov. 29, ***saying that a follow-up investigation found that information on 33.7 million customer accounts — nearly its entire user base — had been***

*exposed*. This leak included customers' names, email addresses and delivery addresses. The exposed information did not include payment or login details, Coupang said.

120.    The December 10 New York Times Article additionally discussed the increased regulatory and legal scrutiny as a result of the Data Breach, stating, "Earlier on Wednesday, ***South Korean police investigating the breach raided Coupang's offices in Seoul for a second straight day. Executives were summoned to appear at a hearing to take place next week at South Korea's legislature***, the National Assembly."

121.    On this news, the price per share of Coupang's common stock fell $0.87 or approximately 3.2%, from a closing price of $26.93 per share on December 9, 2025 to close at $26.06 per share on December 10, 2025.

122.    On December 14, 2025, Bloomberg published an article titled "Billionaire Coupang Founder Rejects Summons to Data Leak Hearing" (the "December 14 Bloomberg Article"). The December 14 Bloomberg Article revealed that Defendant Kim had "told South Korean lawmakers he won't attend this week's parliamentary hearing ***on the country's largest-ever Data Breach***, blaming his busy schedule." The December 14 Bloomberg Article additionally revealed that Park Dae-jun and another executive had resigned due to the Data Breach, and that they had also "notified lawmakers that they would not attend after they were summoned by the committee."

123.    The December 14 Bloomberg Article also reported that South Korean lawmakers were looking into further legal action against Coupang, stating, in relevant part:

> The parliamentary committee rejected the executives' refusal to attend and described the move as a 'systematic evasion of corporate responsibility' that betrays public trust. ***The committee will push for legislation to prevent corporate executives from behaving in this matter, it said in a statement.***

124.    Choi Min-hee, who "heads a parliamentary committee for science, ICT, and broadcasting" was quoted in the December 14 Bloomberg Article as stating "Coupang may

attempt to flee beyond the nation's borders, but its responsibility cannot escape those borders[.]"

125.   The next day, The Korea Times published an article titled "Coupang Data Breach fuels calls to expand class action lawsuits" (the "December 15 Korea Times Article"). The December 15 Korea Times Article quoted Lee Jae, Myung, the President of South Korea ("President Lee"), who urged the "swift" implementation of a class action system because of the Data Breach. The December 15 Korea Times Article quoted President Lee as stating "[e]very Korean has been affected. It makes no sense to ask each victim to file an individual lawsuit[.]" The December 15 Korea Times Article also discussed the public anger against Coupang, stating that President Lee's "comments *came as public anger mounted over the leak of personal information belonging to 33.7 million Coupang users* — roughly two-thirds of Korea's population of 51.7 million."

126.   The same day, Beinsure Media published an article titled "Coupang data breach traced to ex-employee with system access" (the "December 15 Beinsure Article") which revealed additional details about the Data Breach. Specifically, the December 15 Beinsure article revealed that the Data Breach had been "traced to a *former* employee who *retained access* to internal systems *after leaving [Coupang],* according to South Korean police." The December 15 Beinsure Article further stated:

> As the investigation [of the Breach] progressed, police identified the primary suspect as a 43-year-old Chinese national who previously worked at Coupang.
>
> According to JoongAng Daily, the man joined the company in November 2022 and was assigned to authentication management systems. *He left the firm in 2024 but allegedly retained access credentials*. Authorities believe he has already left South Korea.
>
> Investigators said Coupang is currently treated as the victim in the case. *Still, they warned that if negligence or legal violations emerge, the company and staff responsible for safeguarding customer data could face liability.*

127.    On this news, the price per share of Coupang's common stock fell $1.30 or approximately 5.1%, from a closing price of $25.63 per share on December 12, 2025 to close at $24.33 per share on December 15, 2025. The next day, Coupang's common stock fell $1.14 per share, or approximately 4.7%, to close at $23.19 on December 16, 2025.

128.    The truth fully emerged on December 16, 2025, after the market closed, when Coupang filed the December 2025 Form 8-K. The December 2025 Form 8-K revealed additional details about the Data Breach, stating:

On November 18, 2025, Coupang Corp. ("Coupang Corp."), a wholly-owned Korean subsidiary of Coupang, Inc. (Coupang Corp., together with Coupang, Inc. ("Coupang, Inc.," "our," or "we") and its subsidiaries and affiliates, "Coupang,"), became aware of a cybersecurity incident involving unauthorized access to customer accounts (the "Incident"). Upon discovery, Coupang activated its incident response processes, disabled the threat actor's unauthorized access, reported the Incident to the relevant Korean regulatory and law enforcement authorities, and warned customers whose data was potentially accessed.

Based on investigative findings, Coupang has determined that a former employee may have obtained the name, phone number, delivery address, and email address associated with up to 33 million customer accounts, and certain order histories for a subset of the impacted accounts. To Coupang's knowledge, the former employee has not publicly disclosed the obtained data. No Coupang customers' banking information, payment card information, or login credentials were obtained or otherwise compromised in the Incident. Coupang is continuing its investigation and has engaged external forensic experts to assist with the investigation. Korean regulators have initiated investigations with which Coupang is fully cooperating. While one or more Korean regulators will potentially impose financial penalties, at this time we cannot reasonably estimate any amount of losses or range of losses that may result from such penalties.

Coupang's operations have not been materially disrupted. Coupang remains subject to various risks due to the Incident, including diversion of management's attention and potentially material financial losses resulting from the potential loss of revenue and potential higher expenses, including from remediation, regulatory penalties, and litigation.

The former chief executive officer of Coupang Corp., our Korean subsidiary, resigned on December 10, 2025, and Harold L. Rogers, General Counsel and Chief Administrative Officer of Coupang, Inc., is serving as interim chief executive officer of the Korean subsidiary.

129.   On this news, the price per share of Coupang's common stock fell $0.47, or 2.0%, from a closing price of $23.19 per share on December 16, 2025 to close at $22.72 per share on December 17, 2025.

## SUBSEQUENT DEVELOPMENTS

130.   On December 29, 2025, Coupang issued a press release updating investors on the Data Breach investigation (the "December 29 Press Release"). The December 29 Press Release announced that Coupang plans to distribute purchase vouchers worth around 1.685 trillion won, or around $1.2 billion, to 33.7 million users starting January 15, 2026. The December 29 Press Release further announced that Coupang was planning to notify the 33.7 million customer accounts that were affected via text messages about the use of the purchase vouchers.

## REPURCHASES OF COMPANY STOCK

131.   According to the 3Q 2025 Form 10-Q, between August 1, 2025 and August 31, 2025, Coupang purchased 2,185,200 shares of its own common stock at an average price of $28.37 per share for a total cost to the Company of approximately $62 million.[15]

132.   As the Company's stock was actually worth only $22.72 per share, the price at which it was trading when the market closed on December 17, 2025, the Company overpaid by over $12.3 million for repurchases of its own stock between August 1, 2025 and August 31, 2025.

133.   According to the 3Q 2025 Form 10-Q, between September 1, 2025 and September 30, 2025, Coupang purchased 650,000 shares of its own common stock at an

---

[15] Upon information and belief these repurchases were made during the Relevant Period.

average price of $28.50 per share for a total cost to the Company of approximately $18.5 million.

134.    As the Company's stock was actually worth only $22.72 per share, the price at which it was trading when the market closed on December 17, 2025, the Company overpaid by approximately $3.8 million for repurchases of its own stock between September 1, 2025 and September 30, 2025.

135.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $16.1 million.

## DAMAGES TO COUPANG

136.    As a direct and proximate result of the Individual Defendants' conduct, Coupang has lost and will continue to lose and expend many millions of dollars.

137.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

140.    Such losses include the Company's overpayment of over $16.1 million for repurchases of its own stock during the period when the Company's stock price was artificially-inflated due to the false and misleading statements discussed herein.

141.    Additionally, these expenditures include, but are not limited to, unjust

compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

142.  As a direct and proximate result of the Individual Defendants' conduct, Coupang has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

143.  Plaintiff brings this action derivatively and for the benefit of Coupang to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Coupang, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

144.  Coupang is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145.  Plaintiff is, and has been at all relevant times, a shareholder of Coupang. Plaintiff will adequately and fairly represent the interests of Coupang in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

146.  Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

147.  A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Coupang's Board consisted of the following eight individuals: Defendants Kim, Child, Franceschi, Mehta, Sharma, Sun, Toubassy, and Warsh (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

148.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause Coupang to overpay by over $16.1 million for repurchases of its own stock at artificially inflated prices, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

149.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Coupang to engage in the Cybersecurity misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused Coupang to issue false and misleading statements which were intended to make Coupang appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

150.    Additional reasons that demand on Defendant Kim is futile follow. Defendant Kim founded Coupang and has served as its CEO and Chairman of the Board since May 2010. Defendant Kim is also a controlling shareholder in the Company. As such, the Company provides Defendant Kim with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. Defendant Kim also signed the SOX certifications attesting to the accuracy of the 2Q 2025 Form 10-Q and the 3Q 2025 Form 10-Q. As the Company's highest officer during the Relevant Period, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make/or cause the Company to make

false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct and/or personally made the false and misleading statements alleged herein. Additionally, Defendant Kim is named as a defendant in the Securities Class Action. For these reasons too, Defendant Kim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Child is futile follow. Defendant Child has served as a Company director since April 2022. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Child has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Child breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Franceschi is futile follow. Defendant Franceschi has served as a Company director since March 2022. He also serves as a member of the Compensation Committee. Defendant Franceschi has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to

monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Franceschi's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons too, Defendant Franceschi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Mehta is futile follow. Defendant Mehta has served as a Company director since December 2010. Defendant Mehta has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Mehta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Sharma is futile follow. Defendant Sharma has served as a Company director since June 2024. She also serves as a member of the Compensation Committee. Defendant Sharma has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Sharma breached her

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Sun is futile follow. Defendant Sun has served as a Company director since July 2010. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Sun has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sun's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the schemes. For these reasons too, Defendant Sun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Toubassy is futile follow. Defendant Toubassy has served as a Company director since March 2023. She also serves as a member of the Audit Committee. Defendant Toubassy has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Toubassy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

157. Additional reasons that demand on Defendant Warsh is futile follow. Defendant Warsh has served as a Company director since October 2019. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Warsh has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Warsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on the Board is futile follow.

159. Defendants Child (as Chair), Sun, and Toubassy (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

160. In violation of the Code of Conduct, the Director-Defendants conducted little,

if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Cybersecurity Misconduct and to make and/or cause the Company to make materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is futile as to them.

161.    Coupang has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Coupang any part of the damages Coupang suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

162.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

163.    The acts complained of herein constitute violations of fiduciary duties owed

by Coupang's officers and directors, and these acts are incapable of ratification.

164.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Coupang. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Coupang, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

165.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Coupang to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

166.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.  The Individual Defendants, by virtue of their positions with Coupang and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Coupang and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Coupang to engage in the illegal conduct and practices complained of herein.

169.  Plaintiff, on behalf of Coupang, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Exchange Act**

170.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.  The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Coupang. Not only is Coupang now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Coupang by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Coupang.

172.  During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

173.  The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the

making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Coupang not misleading.

174.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Coupang.

175.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

176.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

177.   Plaintiff, on behalf of Coupang, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

178.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Coupang's business and affairs.

180.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

181.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Coupang.

182.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Cybersecurity Misconduct.

183.    Also in breach of their fiduciary duties owed to Coupang, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Coupang suffered a Data Breach which allowed a former employee to access customer information for approximately six months due to Coupang's inadequate cybersecurity procedures; (2) the Company engaged in the Cybersecurity Misconduct; and (3) as a result, Coupang suffered increased legal and regulatory scrutiny. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

184.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

185.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

186.    In yet further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were trading at artificially inflated prices before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $31 million.

187.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and

they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Coupang's securities.

188.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Coupang's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Coupang has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf of Coupang, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

193.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Coupang.

194.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Coupang that was tied to the performance or artificially inflated valuation of Coupang, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

195.   Plaintiff, as a shareholder and a representative of Coupang, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

196.   Plaintiff, on behalf of Coupang, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Abuse of Control**

197.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Coupang, for which they are legally responsible.

199.   As a direct and proximate result of the Individual Defendants' abuse of control, Coupang has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.   Plaintiff, on behalf of Coupang, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

201.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Coupang in a manner consistent with the operations of a publicly held corporation.

203.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Coupang has sustained and will continue to sustain significant damages.

204.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

205.   Plaintiff, on behalf of Coupang, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

206.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

208.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Coupang to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

209.   As a result of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

210.    Plaintiff, on behalf of Coupang, has no adequate remedy at law.

### EIGHTH CLAIM
**Against Defendants Kim and Anand for Contribution Under Sections 10(b) and 21D of the Exchange Act**

211.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212.    Coupang and Defendants Kim and Anand are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kim's and Anand's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

213.    Defendants Kim and Anand, because of their positions of control and authority as controlling shareholders, officers, and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

214.    Accordingly, Defendants Kim and Anand are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

215.    As such, Coupang is entitled to receive all appropriate contribution or indemnification from Defendants Kim and Anand.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor

against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Coupang, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Coupang;

(c)    Determining and awarding to Coupang the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Coupang and the Individual Defendants to take all necessary actions to reform and improve Coupang's corporate governance and internal procedures to comply with applicable laws and to protect Coupang and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Coupang to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Coupang restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and

proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: January 5, 2026                    Respectfully submitted,

                                          **THE BROWN LAW FIRM, P.C.**

                                          */s/*Robert C. Moest            .
                                          Robert C. Moest, Of Counsel, SBN 62166
                                          2530 Wilshire Boulevard, Second Floor
                                          Santa Monica, CA 90403
                                          Telephone: (310) 915-6628
                                          Facsimile: (310) 915-9897
                                          Email: RMoest@aol.com

                                          **THE BROWN LAW FIRM, P.C.**
                                          Timothy Brown
                                          767 Third Avenue, Suite 2501
                                          New York, NY 10017
                                          Telephone: (516) 922-5427
                                          Facsimile: (516) 344-6204
                                          Email: tbrown@thebrownlawfirm.net

                                          *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

      I, Jason Warga, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th  day of January, 2026.

Signed by:

F504B84F25FB4AC...

Jason Warga